# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

ABRAR FAIAZ,

Plaintiff,

v.                                                    5:14-CV-322
                                                       (GTS/ATB)

COLGATE UNIVERSITY, et al.,

Defendants.

---

JOSHUA S MOSKOVITZ, ESQ., for Plaintiff
LAURA A. HARSHBARGER, ESQ., for Defendants

ANDREW T. BAXTER
United States Magistrate Judge

## MEMORANDUM-DECISION and ORDER

Presently before the court is the defendants' motion for partial judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. No. 21). Plaintiff opposes the motion, and defendants have filed a reply. (Dkt. Nos. 29-30, 33, 36). Plaintiff has also filed a letter, requesting that the court consider additional "previously unavailable" evidence in opposition to defendants' motion, and defendants have opposed. (Dkt. Nos. 39, 40). This matter was referred to me by the Honorable Glenn T. Suddaby, upon consent of the parties, pursuant to 28 U.S.C. § 636(c) for final resolution of this motion only. (Dkt. Nos. 37-38).

## I.    Background

### A.    Facts

Both parties have reviewed the facts of this case extensively in their memoranda of law, and the court assumes the parties familiarity with the relevant facts. The motion

for judgment on the pleadings applies only to some of plaintiff's claims.  However, I

will include a brief summary of the facts as stated in the complaint.

In the spring of 2013, Rachel Valdivieso, a Colgate University ("CU") student

with whom plaintiff once had a brief relationship, reported to CU officials[1] that plaintiff

had pushed her in 2012. (Complaint ("Compl.") ¶ 37) (Dkt. No. 1).  Plaintiff alleges

that Ms. Valdivieso reported the incident a year after it happened "because of [another]

incident from 2011 involving [plaintiff] and another student, Yuliya Karashel."

According to plaintiff, Ms. Valdivieso's 2013 allegations were "suspicious," and made

only out of jealousy because plaintiff had "rekindled" his relationship with Ms.

Karashel. (Compl. ¶¶ 2, 38).  Specifically, Ms. Valdivieso alleged that in 2011, plaintiff

had pushed Ms. Karashel, resulting in her falling, hitting her head against a table, and

receiving stitches for the injury. (Compl. ¶ 38).  Officer Kane prepared an Incident

Report, regarding Ms. Valdivieso's email, assigning a "case number" to each incident.

(Compl. ¶ 39).  The report was dated February 26, 2013 and was sent to defendant

Taylor. (*Id.*)

When defendant Valerie Brogan, an Investigator in the CU Campus Safety

Department, attempted to contact Ms. Valdivieso to schedule a meeting, Ms. Valdivieso

responded that "she was on leave from school." (Compl. ¶ 40).  Plaintiff alleges that

ultimately, defendants determined to investigate the incident between plaintiff and Ms.

Karashel, even though she did not personally make the complaint. (Compl. ¶¶ 42-44).

---

[1] Plaintiff states that Ms. Valdivieso made this report by e-mail to Robert Kane, III (a CU Campus Security Officer) with a copy to defendant Brogan on February 20, 2013. (Compl. ¶ 35).

Defendants Kimberly Taylor[2] and Marilyn Rugg[3] assigned defendant Brogan to conduct the investigation. (Compl. ¶¶ 42-44). Defendant Brogan interviewed Ms. Karashel, who prepared an initial written statement at defendant Brogan's request.[4] (Compl. ¶¶ 47-51)).

Defendant Brogan contacted plaintiff and scheduled a meeting with him for March 22, 2013. (Compl. ¶ 54). In a letter, dated March 21, 2013, defendant Taylor ordered plaintiff to have no contact with either Ms. Valdivieso or Ms. Karashel. (Compl. ¶ 55). The meeting between plaintiff and defendant Brogan, which was also attended by defendant Christina Khan,[5] took place on March 22, 2013. Plaintiff alleges that the meeting/interrogation was "aggressive" and lasted for an extended period of time. (Compl. ¶¶ 75-76). Plaintiff claims that he was deprived of food until shortly after he informed the defendants that he was feeling dizzy and faint. (Compl. ¶ 75). Following the meeting, defendant Brogan prepared a report, plaintiff was given a copy of the March 21st "no-contact"[6] order, and he was told that he was placed on interim

---

[2] Kimberly Taylor was the Associate Dean for Conduct and the University Disciplinary Officer at CU. (Compl. ¶ 18).

[3] Marilyn Rugg was the Associate Provost for Equity and Diversity and the Title IX Coordinator at CU. (Compl. ¶ 17).

[4] It appears that Ms. Karashel did not prepare the written statement immediately because the complaint states that on March 25, 2013, defendant Brogan "pressured" Ms. Karashel to "provide a written statement as soon as possible." (Compl. ¶ 25).

[5] Christina Khan is the Assistant Dean and Director of International Student Services at CU. (Compl. ¶ 15). Plaintiff alleges that defendant Rugg sent defendant Khan to be present during the meeting/interrogation to "support" plaintiff. (Compl. ¶ 68).

[6] Plaintiff and Ms. Karashel subsequently violated the no-contact order at approximately 6:00 p.m. on March 23, 2013, when Ms. Karashel "came to the window outside of [plaintiff's] room in

suspension. (Compl. ¶¶ 77-79). Plaintiff was also informed that his disciplinary hearing

would be held on April 1, 2013 "at the earliest." (Compl. ¶ 82).

Defendant Taylor informed plaintiff that he would be detained "in the basement

of Curtis Hall," pending his disciplinary hearing, and he would not be allowed to go

anywhere else. (Compl. ¶¶ 83-84). Plaintiff alleges that defendant Taylor told plaintiff

that if he wanted to forego staying in Curtis Hall pending the disciplinary hearing, he

could return home to Bangladesh, and CU would pay for the flight. Plaintiff would

then be given the opportunity to participate in the disciplinary hearing by "Skype" or by

telephone. (Compl. ¶ 85). Plaintiff opted to stay in the United States, and at

approximately 10:00 p.m. on March 22, 2013, he was escorted by Campus Safety

Officers from the location of his interrogation to his dormitory room, where he was

given the opportunity to gather some personal belongings and then was taken to Curtis

Hall, where he stayed until noon on March 24, 2013. (Compl. ¶¶ 86-87).

Plaintiff claims that the Curtis Hall room was dirty, had no "drinking water" in

it,[7] and had no cellular reception or Wi-Fi, which prevented plaintiff from

communicating with his family or friends. (Compl. ¶ 88). Plaintiff claims that

defendant Khan came to visit him in order to encourage him to return home. However,

Curtis Hall and passed an unsolicited note to him." (Compl. ¶ 98). This behavior was observed by a
Campus Security Officer. (*Id.*)

[7] Plaintiff was brought drinking water after former defendant Jones visited plaintiff. (Compl.
¶ 93). Defendant Jane Anne Jones is the Director of Counseling and Psychological Services/
Coordinator of Alcohol and Other Drug Services at CU. (Compl. ¶ 22). Ms. Jones was voluntarily
dismissed as a defendant in this action, along with defendants Thaddeus J. Mantaro (Director of the
Shaw Wellness Institute at CU), and Kevin Alt (a CU Campus Safety Officer). (Dkt. Nos. 24-25).

4

it appears that defendant Kahn was also responsible for having plaintiff escorted back to his dormitory room at approximately midnight on March 22, 2013 so that he could obtain an ethernet cable and "several other belongings." (Compl. ¶ 90). Defendant Khan was also responsible for bringing plaintiff a telephone on March 23, 2013. (Compl. ¶ 95). Plaintiff contacted professor Melissa Kagle,[8] plaintiff's "host" parent. (Compl. ¶ 96). Although plaintiff claims that the request to stay with Professor Kagle was initially "denied," plaintiff was sent home with Professor Kagle and her partner at 11:00 a.m. on March 24, 2013. (Compl. ¶¶ 96, 101).

Plaintiff received a "charge letter," stating that plaintiff violated CU policy, based on five incidents involving Ms. Karashel and one incident involving Ms. Valdivieso. (Compl. ¶ 111). The disciplinary hearing was scheduled for April 2, 2013. (*Id.*) Plaintiff states that he tried, without success, to adjourn the hearing date.[9] (Compl. ¶¶ 122-27). In the interim, on March 29, 2013, plaintiff went to the Campus Security Office to review the evidence against him. (Compl. ¶ 115). Plaintiff claims that while he was reviewing the files, defendants Cook and Tucker verbally harassed him. (Compl. ¶¶ 116-18).

Plaintiff claims that eventually, he felt too intimidated to continue reviewing the documents and sent a text message to Professor Kagle in an effort to get a ride back to her house. (Compl. ¶ 118). Defendant Cook "demanded to know" who plaintiff was

---

[8] Plaintiff acknowledges that when he first tried to contact Prof. Kagle on March 23, 2014, she was "on a ski trip away from [CU]." (Compl. ¶ 94).

[9] Plaintiff alleges that Professor Kagle also tried, without success, to adjourn the hearing date. (Compl. ¶¶ 122, 127).

texting, and "[s]everal minutes later" Professor Kagle was "pulled over by a Hamilton Police Officer," but was not issued a citation. (Compl. ¶ 119). Plaintiff claims that defendant Cook told plaintiff that Cook's "partner" in the Hamilton Police Department told Cook that plaintiff's "host mom" had been pulled over and "would not be coming to get him."[10] (*Id.*)

Plaintiff claims that on April 1, 2013, defendants Khan and Suzy M. Nelson[11] held a video "Skype" call with plaintiff's family and told them that criminal charges "may be pursued" against plaintiff. (Compl. ¶ 123). These defendants encouraged plaintiff's family to persuade plaintiff to return home to Bangladesh. (*Id.*) Plaintiff's hearing was conducted on April 2, 2013, under the Equity Grievance Process ("EGP"), but neither Ms. Karashel, nor Ms. Valdivieso testified. (Compl. ¶ 134). The hearing panel was chaired by defendant Taylor, with defendants Setlak,[12] Palmer,[13] and Darby[14] as members. (Compl. ¶ 135). Defendant Brogan presented the case based upon her investigation. (*Id.*) During the hearing, plaintiff claims that he was asked whether his "religion or culture was the reason for his actions." (Compl. ¶ 136). Plaintiff presented two witnesses, but claims that he would have called others if he had been given sufficient time to prepare. (Compl. ¶ 137-38).

---

[10] Another individual came to get plaintiff that night. (Compl. ¶ 120).

[11] Suzy M. Nelson is Vice President and Dean of CU. (Compl. ¶ 16).

[12] Peter Setlak is the Managing Director of Networks, Systems and Operations at CU. (Compl. ¶ 26).

[13] Letta Palmer is an Administrative Assistant at CU. (Compl. ¶ 25).

[14] Margaret F. Darby is an Associate Professor of Writing and Rhetoric at CU. (Compl. ¶ 24).

After the hearing, defendant Taylor told plaintiff that the panel had decided to expel him, but refused to explain the reasons for the chosen sanction. (Compl. ¶ 140). Defendant Brogan contacted Ms. Karashel to inform her of the panel's decision to expel plaintiff. (Compl. ¶ 142). Plaintiff appealed, defendant Nelson recused herself, and appointed defendant Douglas A. Hicks[15] to hear the appeal. (Compl. ¶¶ 143-50). The appeal was supported by a new statement from Ms. Karashel, alleging inter alia, that she was pressured by defendant Brogan to give her earlier statement, and that Ms. Karashel was not aware how her earlier statement would be used. (Compl. ¶ 147). Plaintiff's appeal was denied. (Compl. ¶ 150).

The day after defendants denied plaintiff's appeal, defendants Khan and Taylor contacted plaintiff and told him that he had to leave the country immediately because his student visa was terminated when he was expelled. (Compl. ¶ 159). Plaintiff left Hamilton and moved to New York City in May of 2013. (Compl. ¶ 166). Plaintiff claims that in August of 2013, officers from the Immigration and Customs Enforcment office came to Professor Kagle's door, asking about plaintiff, and "told Prof. Kagle certain things that they could only have learned from Colgate including, that they knew [plaintiff] had stayed with [Kagle] and that he had been "'kicked off campus.'" (Compl. ¶ 160).

### B.     Procedure

Plaintiff has sued CU, its Board of Trustees, and several of its employees in conjunction with his claim of improper and discriminatory expulsion from CU in 2013.

---

[15] Douglas A. Hicks is the Provost and Dean of the Faculty of CU.

(*See* Compl.)  Plaintiff challenges all aspects of the procedures used to discipline him as well as the discipline imposed.  The complaint contains fourteen causes of action. (Compl. ¶¶ 201-267).  Plaintiff alleges violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.;[16] violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.;[17] violations of 42 U.S.C. §§ 1981, 1983, 1985(3), and 1986;[18] violations of the New York State Constitution;[19] violations of the New York State Human Rights Law ("HRL"), N.Y. Exec. Law § 296(4);[20] and state common law claims of False Imprisonment; Breach of Contract, Failure to Substantially Observe the University's Established Procedures, Negligence, Intentional Infliction of Emotional Distress, and "Respondeat Superior."[21]

## II.    Judgment on the Pleadings

### A.    Legal Standards

After the pleadings are closed, a motion to dismiss for failure to state a claim is properly brought as a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  *Maggette v. Dalsheim*, 709 F.2d 800, 801 (2d Cir. 1983) (citations omitted).  *See* Fed. R. Civ. P. 12(b), 12(c) and 12(h)(2).  The motion for judgment on the pleadings is

---

[16] (First Cause of Action, Compl. ¶¶ 201-205).

[17] (Second Cause of Action, Compl. ¶¶ 206-210).

[18] (Third-Sixth Causes of Action, Compl. ¶¶ 211-30).

[19] (Seventh Cause of Action, Compl. ¶¶ 231-35).

[20] (Eighth Cause of Action, Compl. ¶¶ 236-41).

[21] (Ninth-Fourteenth Causes of Action, Compl. ¶¶ 242-67).

then treated according to the same standard as a motion to dismiss under Rule 12(b)(6).
*Id.*

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp.*, 550 U.S. at 555 (citation omitted). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir. 1995).

In deciding a motion to dismiss, the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice. *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009). The court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72

(the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

However, even if a document may be considered "integral" to the complaint, "'it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.'" *DiFolco*, 622 F.3d at 111 (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). It must also be clear that "'there exist no material disputed issues of fact regarding the relevance of the document.'" *Id.* The court may properly consider documents or information contained in defendants' motion papers if the plaintiff has knowledge of the material and relied on it in drafting the complaint. *Galtieri v. New York City Police Pension Fund*, No. 12 Civ. 1159, 2014 WL 4393927, at *7 (S.D.N.Y. Sept. 15, 2014) (citations omitted).

## B.    Application

Before I consider the merits of defendants' motion for partial judgment on the pleadings, I must resolve the issue of which documents may be reviewed as part of the motion.

### 1.    Defendants' Materials

There are two ways in which the defendants' documents may be considered: either as exhibits to their answer or as materials integral to the complaint.[22] Fed. R. Civ. P. 10(c) provides that "[a] copy of a written instrument that is an exhibit to a

---

[22] If these materials are considered "integral" to the complaint, they could be considered even if they were not exhibits to the answer.

pleading is a part of the pleading for all purposes." As "part of" the answer, any instruments attached thereto would then be considered in a motion for judgment on the pleadings.

Plaintiff argues that the defendants' declarations and the emails referenced therein are not "instruments" for purposes of Rule 10, notwithstanding that they are attached to the answer. Plaintiff argues that the instruments to which Rule 10 refers are documents such as contracts, wills, promissory notes, or share certificates: written legal documents that define rights, duties, entitlements or liabilities. (Pl.'s Mem. of Law at 14) (citing Black's Law Dictionary) (Dkt. No. 33). *See United States v. Int'l Longshoremen's Assn.*, 518 F. Supp. 2d 422, 465 (E.D.N.Y. 2007) (defining "instrument" as a document such as a deed, will, bond, lease, insurance policy, or security agreement). This court need not decide whether the documents attached to the defendants' answer are "instruments" for purposes of Rule 10(c) because the documents are all referenced in, and integral to, the complaint.

Defendants have attached two declarations to their amended answer. The first "declaration" is by defendant Brogan, and the second declaration is by defendant Taylor. (Dkt. No. 16-1, 16-2). The Brogan Declaration states only that she is employed by CU as an Investigator for the CU Security Department, who was directly involved in investigating the complaints levied against plaintiff. (Brogan Decl. ¶ 1). The rest of the declaration refers to documents, attached as exhibits to the declaration, with a citation to the paragraph in the complaint where the document is mentioned and relied upon for plaintiff's claims. (Brogan Decl. ¶¶ 2-3). These exhibits were filed under seal and

include the complainant's first statement.

In Kimberly Taylor's declaration, she states that she is employed by CU as the Associate Dean for Conduct and the CU Disciplinary Officer. (Taylor Decl. ¶ 1). She states that she is responsible for overseeing the CU student disciplinary policies and procedures, and that she was directly involved in the disciplinary charges and procedures that are the subject of plaintiff's action. (*Id.*) The rest of the declaration simply refers to documents, attached as exhibits to her declaration, with a citation to the paragraph where the document is mentioned and relied upon in the complaint.

The defendants' declarations do not contain contested statements of fact. The defendants simply identify themselves and identify the documents which are attached to their declarations, all of which are also referenced in the complaint. None of the identifying information in the declarations is disputed by plaintiff, and each document attached to the defendants' declarations is incorporated by reference and relied upon in the complaint as part of the basis for plaintiff's claims. In *L 7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 421-22 (2d Cir. 2011), the Second Circuit held that emails attached to a defendant's answer/counterclaim were properly considered and stated that '[t]here is no question that the email exhibits were "attached" to Old Navy's Answer, even if they were only "part of" Old Navy's Counterclaims. *Id.* (citing Fed. R. Civ. P. 10(c). The court also stated that plaintiff L-7 had notice of all the emails in question "because L–7 sent or received them." *Id. See also Viteritti v. Incorporated Village of Bayville*, 831 F. Supp. 2d 583, 589 (E.D.N.Y. 2011) (court considered materials attached to answer under Rule 10(c)).

The same is true for the emails attached to defendant Taylor's declaration. Plaintiff either sent or received the emails that are attached to this declaration, and plaintiff incorporated them by reference into his complaint. Plaintiff claims that the documents attached to the Brogan declaration, consisting of the emails by the two alleged victims in this case, are hearsay and incomplete.[23] In *DJL Mortgage Cap., Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 233-34 (E.D.N.Y. 2010), the court cited *United States v. Int'l Longshoremen's Assn*. and stated that "the court did not intend to state a hard and fast rule that the only acceptable 'exhibits' are those with independent legal effect." 725 F. Supp. 2d at 234. The reason that the exhibits to the pleading were rejected in *Longshoremen's Assn.* is that they consisted of "lengthy pleadings in prior legal actions involving the defendants," and contained "'entire legal theories that appear[ed] nowhere on the face of the Amended Complaint." *Id.*

In *Routh v. University of Rochester*, 981 F. Supp. 2d 184, 191 (W.D.N.Y. 2013), in conjunction with a very similar set of facts, the court specifically considered the dean's letter to the plaintiff, containing the disciplinary charges against him; the university's standard of conduct; the university's written decision to expel the plaintiff; the plaintiff's appeal of the expulsion; the decision denying the appeal; and various other documents that the court found were "integral to the complaint," and incorporated by reference, because plaintiff had relied upon them in drafting his pleadings. The court also noted that the "documents [were] integral to understanding the underlying

---

[23] Plaintiff alleges that defendants attached only the first of Ms. Karashel's two written statements. (Pl.'s Mem. of Law at 13).

administrative proceeding" that plaintiff maintained was "arbitrary and capricious." *Id.*

In this case, the exhibits attached to the defendants' declarations do not pose any new allegations or theories, and both plaintiff and defendants were well aware of the documents and the facts asserted therein. Plaintiff cites *Rose v. Bartle*, 871 F.2d 331, 339 n.3 (3d Cir. 1989) for the proposition that lengthy exhibits containing "evidentiary matter" should not be attached to the pleadings. The court in *Rose* also rejected the idea that affidavits were appropriate as attachments to pleadings. *Id.* The declarations in this case are not the kind of affidavits that contain "lengthy" evidentiary material. The affidavits only identify the documents attached, and the documents are only those referred to by plaintiff in drafting the complaint. Thus, the court will consider the additional materials attached to defendants' answer.

### 2. Plaintiff's Additional Materials

On September 9, 2014, plaintiff's counsel filed his own set of documents and requested that the court consider them in deciding this motion. (Dkt. Nos. 29, 30). These materials consist of plaintiff's own "Declaration," together with a document identified as Ms. Karashel's second statement. (Dkt. No. 30); a "Voluntary Statement" in an unrelated matter (Pl.'s Ex. 1) (Dkt. No. 29); a "Notice of Intent to Use Identification Evidence" in an unrelated matter (Pl.'s Ex. 2) (Dkt. No. 29); the response to another student's disciplinary appeal, written by defendant Suzy M. Nelson (Pl.'s Ex. 3) (Dkt. No. 29); the CU Code of Student Rights and Responsibilities (excerpted from the CU Student Handbook, 2014-15) (Pl.'s Ex. 4) (Dkt. No. 29); and the Statement of Nondiscrimination Policy, (excerpted from the CU Student Handbook, 2014-15) (Pl.'s

Ex. 5) (Dkt. No. 29).

Most recently, plaintiff has requested that the court consider two additional documents. (Dkt. No. 39). One document is a report, dated June 2, 2014, from the Advisory Committee on Campus Security, (Dkt. No. 39-1), and the second document, is a Memorandum, written by defendant President Jeffrey Herbst, with the subject title "Response to Advisory Committee on Campus Safety Report." (Dkt. No. 39-2). This memorandum responds to questions and "concerns" regarding the Equity Grievance Policy and process. (*Id.*)

Plaintiff's declaration contains additional facts and arguments that this court will not consider in a motion for judgment on the pleadings. The court does note that in his complaint, plaintiff does refer to a "second statement" by Ms. Karashel (Compl. ¶ 147). The complaint alleges that plaintiff's "appeal" was supported by this second statement. (*Id.*) However, the court also notes that the statement attached to plaintiff's declaration is unsigned, undated, and unattested. To the extent that plaintiff claims that this is the statement that he attached to his appeal, the court could consider it as incorporated by reference.

Plaintiff has filed additional materials that are totally unrelated to his case, both in his initial opposition to the defendants' motion and in his October 2014 submission of two additional documents. They include documents that plaintiff could not have relied upon in drafting the complaint, particularly documents from unrelated investigations in which defendant Brogan appears to have been involved, and assessments of the Equity Grievance Process ("EGP"), drafted long after the incidents

in this case occurred and were investigated. These documents may not be considered in a motion for judgment on the pleadings, and this court will not convert the motion into one for summary judgment to consider these materials. (*See* Pl.'s Ex. 1-3 in Dkt. No. 29 and Pl.'s Ex. 1-2 in Dkt. No. 39).

Plaintiff has also submitted excerpts from CU's Student Handbook for 2014-15. To the extent that the Student Handbook is publicly available on the CU website, the court may consider it as the current handbook.

## III. Color of State Law

### A. Legal Standards

To state a claim under section 1983, the plaintiff must allege both that the defendant has violated plaintiff's rights under either the Constitution or laws of the United States and that the defendant acted "under color of state law." *Rae v. City of Suffolk*, 693 F. Supp. 2d 217, 223 (E.D.N.Y. 2010); 42 U.S.C. § 1983. A person acts under color of state law when he or she acts in his or her official capacity, "clothed with the authority of state law," or acts under "pretense" of law by purporting to act with official power. *Pleasure Island, Inc. v. City of New York*, No. 12 Civ. 4699, 2013 WL 2311837, at *5-6 (E.D.N.Y. May 24, 2013) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). The requirement that the defendant act under "color of state law" is jurisdictional. *Lucas v. Riggi*, No. 07-CV-6200, 2008 WL 4758706, at *2 (W.D.N.Y. Oct. 29, 2008) (citing *Polk County v. Dodson*, 454 U.S. 312, 315 (1981)). Private conduct is beyond the reach of section 1983 "no matter how discriminatory or wrongful" that conduct may be. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40,

49-50 (1999) (citations omitted). Nominally private conduct may rise to the level of state action when:

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (per curiam) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001) (citations and internal quotation marks omitted)). The nexus to the state must be so close as to be fairly treated as that of the state itself. *Tancredi v. Metro Life Ins. Co.,* 316 F.3d 308, 312 (2d Cir. 2003) (citations omitted). The plaintiff must also allege that the state was involved with the activity that caused the injury, giving rise to the action. *Sybalski*, 546 F.3d at 257-58 (citation omitted).

The issue of whether a private security guard or an off-duty police officer acts under color of state law has been extensively litigated in this and other circuits. *See Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (off-duty officer acted under color of law when he identified himself as a police officer and used his service weapon); *Rivera v. La Porte*, 896 F.2d 691, 695 (2d Cir. 1990) ("off-duty status of an arresting officer does not mean that he is not acting under color of law"); *Swiecicki v. Delgado*, 463 F.3d 489, 496 (6th Cir. 2006) (it is the nature of the act performed, not the clothing or the status of being on or off duty, and relevant considerations include whether the

"officer flashed a badge, identified himself as an officer, or arrested (or threatened to arrest) someone"), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384 (2007); *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999) ("off duty" police officer, working as a mall security guard acted under color of state law when she shot the plaintiff because she was wearing a police uniform, ordered the plaintiff repeatedly to stop, and sought to arrest him); *Fleck v. Trustees of University of Pennsylvania*, 995 F. Supp. 2d 390, 399-402 (E.D. Pa. 2014) (where private security officers are "endowed by law with plenary police powers, such that they are *de facto* police officers, they may qualify as state actors under the public function test"); *Prowisor v. Bon Ton, Inc.*, 426 F. Supp. 2d 165, 170 (S.D.N.Y. 2006) (store security guard did not act in "close nexus" with the state by calling police to arrest a suspected shoplifter - guard was not sworn in as a special patrolman nor were there cooperative actions between guards and police), *aff'd*, 232 F. App'x 26 (2d Cir. 2007).[24]

In *Cancel v. Amakwe*, 551 F. App'x 4, 6-7 (2d Cir. 2013) (summary order), the court found that while a police officer's self-identification and use of a service pistol

---

[24] *See also Watkins v. Oaklawn Jockey Club*, 183 F.2d 440, 443 (8th Cir. 1950) (upholding court's determination after trial that off duty police officer did not act under color of law when he ejected plaintiff from racetrack, noting that officer did not tell plaintiff he was under arrest or use any force to effect ejection); *Jones v. Wet Seal Retail, Inc*., 519 F. Supp. 2d 1164, 1170 71 (D. Kan. 2007) (no state action even though one of the mall security officers was an off duty reserve police officer, wearing a city police uniform with a city-issued badge, plaintiff was physically restrained, confined in an isolated office, and advised that she was going to be arrested by the police and prosecuted for shoplifting); *Moher v. Stop & Shop. Cos*., 580 F. Supp. 723, 725-26 (D. Conn. 1984) (private security officer's telephone call to police to request the arrest of a suspected shoplifter was not under color of state law with two exceptions); *Josey v. Filene's, Inc*., 187 F. Supp. 2d 9, 16 (D. Conn. 2002) (generally private security officers do not act under color of state law unless they are given the authority of state law, or wilfully participate in the joint activity of the State or its agents).

18

could constitute acting under color of state law, the action at issue must be "'***made possible only because the wrongdoer is clothed with the authority of state law***'" *Id.* (emphasis added) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)); *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003)). The court further stated that

> Cancel's theory of the City's delegation of police powers to private businesses is insufficient by itself plausibly to allege that Gibson was acting under color of state law. Gibson was employed by a private business at the time of the alleged assault, and any authority he had over Cancel and other citizens derived solely from that role and was not made possible only because he was "clothed with the authority of state law."

*Id.*

## B. Application

Defendants seek to dismiss the plaintiff's Fourth Cause of Action, a section 1983 claim against defendants Brogan, Cook, and Tucker because none of these defendants acted "under color of state law" for purposes of section 1983 liability. There is no dispute that CU is a private university, and without more, individuals who are employed by CU would not act under color of state law.

Plaintiff argues that defendant Brogan acted under color of state law, in part because she maintains part-time employment with the Hamilton Police Department, and that CU also maintains a cooperative relationship with the Hamilton Police Department in the investigation of criminal or potential criminal charges stemming from incidents that occur on CU property.[25] Plaintiff claims that defendants Brogan, Cook, and Tucker

---

[25] Specifically, plaintiff states that the Campus Safety Department "maintains a '[M]emorandum of Understanding with the Hamilton Police that addresses the investigation of violent

"carry out police functions as part of joint operations with the Hamilton Police Department," and that the "primary role" of the Campus Safety Department includes "criminal investigation." (Pl.'s Br. at 16). In a footnote, plaintiff claims that this "cooperative" relationship was demonstrated when defendant Cook implied to plaintiff that Professor Kagle, who was coming to pick plaintiff up, was "pulled over" by the Hamilton Police at defendant Cook's behest.[26] (Pl.'s Br. at 17 n.9). In any event, the fact that Professor Kagle was pulled over on her way to pick plaintiff up does not make every action by the campus security officers "state action."[27]

None of plaintiff's allegations transform the alleged actions taken by defendants Brogan, Cook, and Tucker into "state action." Even if any or all of the three defendants are employed "part-time" by the Hamilton Police Department, there is absolutely no allegation that they were on-duty when the conduct alleged in this case took place, that the police department was in any way involved with defendant Brogan's investigation into the incidents described in this case, or that defendant Brogan's investigation was

---

felony offenses.'" (Pl.'s Br. at 16).

[26] The footnote states that this was a "reasonable inference" from the fact that defendant Cook asked who plaintiff was texting when plaintiff asked Professor Kagle if she would come and pick him up. (Pl.'s Br. at 17 n.9). Plaintiff also stated that although Professor Kagle was "pulled over," there was no traffic citation issued. Although the complaint states that Professor Kagle did not arrive to get plaintiff that night (another professor came to get him), there is no indication of why she did not arrive, and plaintiff does not allege that her failure to pick him up had anything to do with police conduct. Additionally, there is no indiction that conduct exhibited toward a non-party to the action would convert Cook and Taylor's conduct toward plaintiff into state action.

[27] The Supreme Court has held that in cases arising under section 1983, the "color of state law" requirement has been treated as the equivalent of the "state action" required by the Fourteenth Amendment." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 928 (1982). *See also Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) (equating "color of state law" with "state action"). The court will use the two terms interchangeably.

conducted under the authority of the police department.

The complaint contains no factual statements that would connect the conduct "at issue" to the Hamilton Police Department. The fact that CU may have an agreement to cooperate with the Hamilton Police or to "investigate violent felonies" does not transform defendants' actions into color of state law in this case. As stated above, this was a purely internal CU investigation, and the authority that these defendants had over plaintiff was derived **solely** from the defendants' private employment with CU and not because of any relationship with the police department.

Even if the security officers did complete a "New York State Basic Course for Police Officers,"[28] this would not convert their conduct into "state action." The defendants were not investigating a "violent felony," and there were no criminal charges brought against plaintiff based upon defendant Brogan's purely internal investigation. As the defendants point out, the fact that defendants Khan and Nelson may have mentioned the possibility of criminal charges to plaintiff's parents does not create state action by defendants Brogan, Cook, or Tucker. Plaintiff's conclusory allegation that defendant Cook's demand to know who plaintiff was "texting" somehow led to Professor Kagle being stopped by the Hamilton Police, and that this was evidence of "state action" by defendants Cook and Tucker is not plausible.

This case is distinguishable from *Yuan v. Tops Markets*, No. 5:10-CV-1251, 2012 WL 4491106, at *3 (N.D.N.Y. Sept. 28, 2012), in which the court found, without extensive analysis, that the Cornell University Police act under color of state law

---

[28] (Compl. ¶ 195).

because Cornell University police officers are "special deputy sheriffs" under New York State law. *Id.* (citing N.Y. Educ. Law § 5709(1)). The New York statute specifically refers only to "Cornell."[29] Section 5709 also states that Cornell's police officers have the power of "peace officers" as set forth in section 2.20 of the New York Criminal Procedure Law. N.Y. Educ. Law § 5709(1). As such, those officers act under color of state law. *Yuan, supra.* There is no allegation in this case that the CU officers are similarly deputized, notwithstanding that some of them may work for the Hamilton Police "part-time." Thus, *Yuan* does not support a finding that defendants in this case acted under color of state law.

The same rationale was applied in *Fleck v. Trustees of the University of Pennsylvania*, 995 F. Supp. 2d at 399-402. After reviewing the various factors in determining whether there has been state action for purposes of section 1983, the court in *Fleck* stated that "any approach a court uses must remain focused on the heart of the state action inquiry, which . . . is to discern if the defendant exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 401 (quoting *Groman v. Township of Manalpan*, 47 F.3d 628, 639 n.17 (3d Cir. 1995)). The court in *Fleck* noted that the University of Pennsylvania ("Penn") itself was not a "state actor" because although it was a "state-

---

[29] Part of the reason that Cornell officers have been granted this power may be that, although several of Cornell's individual colleges are private, there are also New York State colleges within Cornell's boundaries. The statute provides for the appointment of "special deputy sheriffs "[f]or the protection of the grounds, buildings and property of Cornell University and of the ***state institutions and property***, or other lands and property under the supervision, administrations and control of said university . . . ." N.Y. Educ. Law § 5709(1) (emphasis added).

22

aided" institution, it was not subject to "pervasive regulation by the state." *Id.*

However, the court acknowledged that private security officers may be deemed to perform public functions for purposes of section 1983 when the security guard is employed by a police department or works "jointly" with a township police officer. *Id.* (citing *Traver v. Meshiry*, 627 F.2d 934 (9th Cir. 1980); *Padover v. Gimbel Bros., Inc.*, 412 F. Supp. 920 (E.D. Pa. 1976)). The court in *Fleck* distinguished these cases from cases in which a security guard was held not to be a state actor when "no state or municipal power was involved" or "when a college security guard, despite also being a local police officer, acts solely in his college-guard capacity." *Id.* at 402 (citing *Robinson v. Davis*, 447 F.2d 753 (4th Cir. 1971)).

The court stated that where private security guards are endowed by law with "plenary police powers, such that they are *de facto* police officers, they may qualify as state actors under the public function test." *Id.* (citing *Romanski v. Detroit Entertainment, LLC*, 428 F.3d 629, 637 (6th Cir. 2005)). The court then found that Penn's police department described itself as the "largest private police department in the Commonwealth of Pennsylvania." *Id.* at 402. The Penn Police Department also stated that it maintained the "second largest number of full-time sworn police officers for all Universities nationwide, both public and private." *Id.* The "patrol zone" of the Penn Police Department extended beyond the boundaries of the University, and the department maintained, among other things, a "fifteen person detective unit that conduct[ed] criminal investigations and crime scene analysis." *Id.* It is not surprising that the court found that the officers were acting under color of state law when they

23

arrested the plaintiff in *Fleck*.

Although the court ultimately held that the Penn Police *Department* was not an entity capable of being sued, the court allowed the section 1983 claim[30] to go forward against Penn and against the individual named officers. *See also Sacko v. University of Pennsylvania*, No. 14-831, 2014 WL 2547802, at *2 (E.D. Pa. 2014) (citing *Fleck* and finding that Penn police act under color of state law). *Cf. Baack v. Rodgers*, No. 14-875, 2014 WL 4632380, at *4 (E.D. Pa. Sept. 17, 2014) (finding that hospital defendants were not state actors because hospital provided security services, noting that where state or municipal police power is not involved, the actions of a security guard are not attributable to the state).

In an effort to show that this result applies here, plaintiff argues that defendant Brogan identified herself as a Village of Hamilton Police Officer "to a complainant in another case," and that the university stated that she identified herself in that manner "under circumstances in which she was in fact acting within her duties on behalf of the Police Department." (Pl.'s Br. at 18). Plaintiff states that "this is further evidence that ***when conducting criminal investigations*** on campus," defendant Brogan acts under color of state law. (*Id.*) (emphasis added). This fact, even if true, does not support plaintiff's assertion that defendant Brogan was acting under color of state law in this

---

[30] The court stated that the individual officers were on patrol on a street within the Penn Police Department's patrol zone, when their efforts to maintain public order failed and they arrested two instigators of the disturbance. 995 F. Supp. 2d at 402. The court found that Pennsylvania law endowed the Penn Police with the "plenary authority of a municipal police department, . . . once the 'exclusive prerogative' of the City of Philadelphia." *Id.*

case,[31] given the analysis above, and given the university's statement that in the "other" case, defendant Brogan was performing duties that were within her duties as a Village of Hamilton Police Officer.[32]  Defendants do not "admit" that defendant Brogan acts under color of state law "whenever" she conducts an investigation into student violence.

Plaintiff alleges that this case is unlike the "security guard" analogy and more akin to the situation in *Marsh v. Alabama*, 326 U.S. 501 (1946), in which the Supreme Court found that a "company town's privately paid police officer" acted under color of state law. (Pl.'s Br. at 19).  However, the Court in *Marsh* actually held that the "company town" had all the indicia of a municipality, notwithstanding its ownership by a private company. 326 U.S. at 507-508.  The Court ultimately held that because the town acted under color of state law, it was subject to liability for constitutional violations under section 1983. *Id.* at 509.  The Court stated that "insofar as the State has attempted to impose criminal punishment on [the plaintiff] for undertaking to distribute religious literature in a company town, its action cannot stand." *Id.*  The Court reversed the plaintiff's conviction. *Id.* at 509-510.

There was no analysis of whether the *police* in *Marsh* acted under color of state

---

[31] The court would point out that the facts in another case are certainly not within the realm of consideration under a motion for judgment on the pleadings, and this court has not considered what was said in the other case or what type of investigation defendant Brogan was conducting.

[32] In a footnote, plaintiff refers to the Madison County District Attorney's Office as being involved in the other case. (Pl.'s Br. at 18 n.10).  The difference between that case and this one is apparent from plaintiff's own description of the situation, including the involvement of the District Attorney's Office.

25

law.  In a discussion of the facts, the court stated that a Jehovah's Witness was arrested for leafleting by a "deputy sheriff" when the Jehovah's Witness would not leave the sidewalk. *Id.* at 503.  After plaintiff's arrest, she was prosecuted under an Alabama statute that made it a crime to enter or remain on the premises of another after having been warned not to do so. *Id.* at 503-504.  There was no further discussion of the individual who arrested her.  However, because the company *town* was found to act under color of state law, its police officers would also act under color of state law.  The holding in *Marsh* has been limited to the facts of that case. *See Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 561-61 (1972) (case involved distributing handbills in a mall, and court noted that *Marsh* involved an "economic anomaly of the past" which was "functionally . . . no different from municipalities of comparable size").

Plaintiff in this case does not allege that CU is the equivalent of a town, itself acting under color of state law, and therefore, its security personnel act under color of state law.  Thus, the *Marsh* analysis is not applicable here.  This case is more similar to a situation in which, although the individual defendants may or may not be employed part-time by the Hamilton police, their actions during the incidents in question were not taken because of the power of the police, in conjunction with a police investigation, or in any way related to a police investigation.[33]  The entire investigation was internal and

---

[33] Plaintiff argues, citing *Terry v. Ohio*, 392 U.S. 1 (1968), that there is still "state action" if the police detain an individual but then release him. (Pl.'s Br. at 18).  The citation to *Terry* does not support plaintiff's position.  *Terry* was a case in which there was no question that the police were performing a function that was permissible *only* because they had authority under state law.  The issue in *Terry* was the justification and scope of the warrantless police intrusion upon an individual's privacy under the Constitution.

led only to university disciplinary proceedings. The defendants did not exercise power *possessed* by virtue of state law and *made possible only* because they were clothed with the authority of state law. Because defendants Brogan, Cook, and Tucker did not act under color of state law, plaintiff's fourth cause of action may be dismissed.

## IV.   Conspiracy 42 U.S.C. §§ 1985 & 1986

### A.   Legal Standards

In order to survive a motion to dismiss conspiracy claims under section 1985, the plaintiff must allege:

> (1) a conspiracy; (2) for the purpose of depriving either directly or indirectly, any person or class of person of the equal protection of the laws; or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Bastuk v. County of Monroe*, No. 12-CV-615, 2013 WL 6092517, at *7 (W.D.N.Y. Nov. 19, 2013) (quoting *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 828-29 (1983) (internal quotation marks omitted). In addition, the conspiracy must be motivated by some racial or otherwise class-based, invidious discriminatory animus. *Id.* (quoting *Britt v. Garcia*, 457 F.3d 264, 270 n.4 (2d Cir. 2006)). It is well settled, however, that a conspiracy is not actionable under the civil rights laws if the alleged conspirators are employees of a single organization, and their actions were taken in the course of their employment. *Id.* at *8 (quoting *Ahmed v. Gelfand*, 160 F. Supp. 2d 408, 413 (E.D.N.Y. 2001) (citing *Girard v. 94th Street and Fifth Ave. Corp.*, 530 F.2d 66, 71

(2d Cir. 1976); *Hermann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978)).

This defense is known as the intracorporate conspiracy doctrine and is based on the assumption that the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment are legally incapable of conspiring with each other. *Varricchio v. County of Nassau*, 702 F. Supp. 2d 40, 62 (E.D.N.Y. 2010). "[T]here is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (citing *Girard, supra*).

### B.  Application

Plaintiff's fifth cause of action alleges a conspiracy to interfere with plaintiff's civil rights under section 1985(3). (Compl. ¶¶ 221-24). Defendants argue that because they are all employed by, or are trustees of, CU, no action for a section 1985 conspiracy can survive. Relying on the language in *Girard*, plaintiff argues that the intracorporate conspiracy defense does not apply because the doctrine applies only when the challenged action is "essentially a single act," and in this case, plaintiff is alleging "a multitude of independent acts by Defendants not related to a single policy or corporate decision." (Pl.'s Br. at 20). In *Bastuk*, however, the court rejected a similar argument by the plaintiff. 2013 WL 6092517 at *8. In *Bastuk*, the court stated that *Girard* did not stand for the proposition that the intracorporate immunity applies only to a "single act of conspiracy as opposed to the multiple acts [that Bastuk] pled in his complaint." *Id.*

The court in *Bastuk* noted that there were some "suggestions" in the case law that the intracorporate immunity doctrine should apply only in circumstances in which the alleged conspiracy involved no more than a single act of discrimination, but this interpretation "responds neither to the text nor to the objectives of § 1985." *Id. See also Johnson v. Nyack Hosp.*, 954 F. Supp. 717, 723-24 (S.D.N.Y. 1997).

A closer analysis of *Girard* itself does not support the plaintiff's argument. In *Girard*, the plaintiff alleged that the conspiracy involved multiple acts by the defendants. 530 F.2d at 70. The court in *Girard* found that the individual defendants committed many different acts, while still finding that there was "but one single business entity with a managerial policy implemented by one governing board . . . ." *Id.* at 71. The court found that the defendants committed such acts as advising the president and the board of directors to deny plaintiff continued occupancy of the premises; refusing to allow the plaintiff to appear at board meetings; refusing to give plaintiff the minutes of the meetings; rejecting her payments; harassing plaintiff by commencing legal proceedings against her; and maliciously telephoning her to harass her at unreasonable hours. *Id.*

The court discussed the statutory requirement that "two or more persons conspire," and found that this requirement is not satisfied by proof that the discriminatory decision reflected the "collective judgment of two or more executives of the same firm." *Id.* (quoting *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir. 1972)). In making this decision, the court distinguished *Rackin v. University of Pennsylvania*, 386 F. Supp. 992 (E.D. Pa. 1974). In *Rackin*, the court refused to apply

the intracorporate conspiracy doctrine because each department of the university that acted adversely to plaintiff had disparate responsibilities and functions, supporting a finding that the actions complained of were committed by several policy making bodies,[34] instead of a single policy by a single policy making body. *Id.*

In this case, although plaintiff attempts to argue that there was no "single act," it is clear that plaintiff is complaining about discrimination against him and about his expulsion from CU based upon his nationality. All of the defendants' conduct was allegedly related to that end. So while the defendants may have engaged in "separate" actions, those actions were all aimed at one alleged goal, and all of the defendants were acting in their capacities as employees of the university.[35] *See Murphy v. City of Stamford*, No. 3:13-CV-942, 2014 WL 1415158, at *4 (D. Conn. April 14, 2014) (the

---

[34] In *Rackin*, the plaintiff alleged sex discrimination by the University, its officers, and certain faculty members. 386 F. Supp. at 1005. The court did not apply the intracorporate conspiracy doctrine because of the "continuing and varied" instances of discrimination and harassment by departments with disparate policy making bodies. In *Girard*, the court found that the "plaintiff's allegations of multiple acts by the directors" were the implementation of a single policy by a single policy making body.

[35] Although plaintiff also alleges that the intracorporate conspiracy doctrine does not apply because the defendants actions were not taken within the "scope of their employment," there is absolutely no support for this statement. No defendant is alleged to have taken action for personal reasons, and although discrimination is not "within" the scope of one's employment, all of the defendants were acting on behalf of the university during the incidents that form the basis for the complaint. *See Vollette v. Watson*, 937 F. Supp. 2d 706, 729 n.21 (E.D. Va. 2013) (finding that acts that are 'fairly and naturally incident' to the employer's business are within the scope of employment even if they are "mistaken or ill-advised, as long as the acts did not arise wholly from external or independent motives). In this case, plaintiff has failed to allege that the defendants were motivated by "an independent personal stake." *See DeLitta v. Village of Mamaroneck*, 166 F. App'x 497, 498 (2d Cir. 2005) (plaintiff must allege that the defendants were conspiring with each other on the basis of personal animus, and not out of any desire to serve the interests of the municipality or corporation); *Tardd v. Brookhaven Nat. Lab.*, 407 F. Supp. 2d 415-16 (E.D.N.Y. 2006). These motives would have to be for a purpose "independent of a purpose to serve [their] employer." *Murphy*, 2014 WL 1415158, at *4 (citing *Lima LS PLS v, PHL Var. Ins. Co.*, No. 3:12-CV-1122, 2013 WL 3327038, at *14 (D. Conn. July 1, 2013)).

allegations that plaintiffs cited as "multiple discriminatory acts" did not show discrete acts of discrimination, but rather were the 'tacit understandings' and 'overt acts' taken in furtherance of one alleged conspiracy).

Finally, plaintiff argues that the intracorporate conspiracy doctrine does not apply to "criminal conspiracies." (Pl.'s Br. at 21). Plaintiff reasons that in this case, "the false imprisonment of Faiaz constitutes the crimes of 'unlawful imprisonment' and 'coercion,'" therefore the doctrine should not apply. However, the case cited by plaintiff in support of his argument interpreted the law as it applied to conspiracies under section 1985(2), which refers to conspiracies to obstruct justice, or to intimidate parties, witnesses, or jurors. 42 U.S.C. § 1985(2).[36] *See McAndrew v. Lockheed Martin, Corp.*, 206 F.3d 1031, 1041 (11th Cir. 2000). While the Eleventh Circuit adopted this interpretation of the law, other courts do not share this view. *See Carhart v. Smith*, 178 F. Supp. 2d 1048, 1066-67 (D. Neb. 1001) (rejecting the *McAndrew* analysis) (citing *Wright v. Illinois Dep't of Children and Fam. Svces.*, 40 F.3d 1492, 1507-08 (7th Cir. 1994)). The court in *Carhart* specifically rejected plaintiff's request to hold that conspiracies alleged under section 1985(2) "'necessarily entail' criminal conspiracies under any number of statutes." 178 F. Supp. 2d at 1066. *See also Vollette v. Watson*, 937 F. Supp. 2d 706, 728-29 & n.20 (E.D. Va. 2013) (distinguishing *McAndrew* on the basis of the subsection of 1985, but also specifically rejecting plaintiff's invitation to recognize a "criminal acts" exception to the intracorporate conspiracy doctrine under Virginia common law). Thus, the intracorporate conspiracy defense applies, and the

---

[36] Plaintiff in this case has alleged claims under section 1985(3), not under section 1985(2)

court will dismiss plaintiff's Fifth Cause of Action.

A claim under 42 U.S.C. § 1986 for failure to prevent the violation of a person's civil rights may not exist absent a viable section 1985 claim. Accordingly, plaintiff's Sixth Cause of Action based upon section 1986 is also dismissed. *See Todd v. Brookhaven Nat. Lab.*, 407 F. Supp. 2d 404, 415 (E.D.N.Y. 2006).

## V.  <u>False Imprisonment</u>

### A.  **Legal Standards**

Plaintiff asserts a state law claim of false imprisonment. (Compl. ¶¶ 242-45). In order to prevail on a false imprisonment claim in New York, the plaintiff must show that

> (1) he was confined, (2) the defendant intended to confine him, (3) the plaintiff was aware of his confinement, (4) the plaintiff did not consent to the confinement, and (5) the defendant's actions were not otherwise privileged.

*P.P. v. City of New York*, No. 13 Civ. 5049, 2014 WL 4704800, at *24 (S.D.N.Y. Sept. 19, 2014) (citing *Frey v. City of New York*, No. 12-CV-2074 (TPG), 2013 WL 706051, at *2 (S.D.N.Y. Feb. 27, 2013) (citing *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003)). *See Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93 (1975). The plaintiff must show that "a reasonable person" would not have felt free to leave under the totality of the circumstances. *Id.*

### B.  **Application**

In this case, plaintiff alleges that, after he was placed on "interim suspension" prior to his hearing, the defendants "imprisoned" him in a "cramped and dirty" room in

the "deserted" basement of Curtis Hall, a building on the CU campus. (Compl. ¶¶ 79, 88). Plaintiff stayed in Curtis Hall, with a Campus Safety Officer posted outside the door, from the night of March 22, 2014 until he was taken to a professor's home on March 24, 2013 at approximately noon. (Compl. ¶¶ 86, 102). Plaintiff was escorted back to his dormitory at one point during this confinement in order to get an ethernet cable for his computer.[37] (Compl. ¶ 90).

Plaintiff states that prior to having him escorted to Curtis Hall, defendant Taylor told plaintiff that "if he wanted to forgo staying in the basement of Curtis Hall, he could return [home] to Bengladesh" and that CU would pay for the flight. (Compl. ¶ 85). Defendant Taylor explained to plaintiff that he could participate in the disciplinary hearing via "Skype" or by telephone. (*Id.*) Plaintiff did not take the opportunity to go home.

Defendants argue that plaintiff's claim for false imprisonment must be dismissed because he consented to the confinement after defendants encouraged him to go home to Bangladesh and offered to purchase him a ticket. Plaintiff claims that he did not consent to the 36-hour "imprisonment" in Curtis Hall, that he only acquiesced because he believed that he had no choice, and that a "Hobson's choice" is not consent. (Pl.'s Br. at 23). In *Frey v. City of New York*, the court stated that it is "well-established" that confinement under a threat can give rise to a claim of false imprisonment. 2013 WL 706051, at *3 (citing inter alia *Samirah v. Sabhnani*, 772 F. Supp. 2d 437, 451

---

[37] According to plaintiff, the room in Curtis Hall had no WiFi and no cellular reception so that plaintiff could not communicate with his family. (Compl. ¶¶ 88, 90).

(E.D.N.Y.2011)).  However, not all threats carry the same weight. *Id.*  In *Frey*, the court distinguished threats of violence, which would suffice to support a lack of consent, with "threats of termination from one's employment and the threat of peaceful arrest," which would not be sufficient to negate consent. *Id.* (citing inter alia *Davis v. City of New York*, No. 06 CV 3323, 2007 WL 2973695 (E.D.N.Y. Sept. 28, 2007)).

In *P.P. v. City of New York*, No. 13-CV-5049, 2014 WL 4704800, at *25 (S.D.N.Y. Sept. 19, 2014), the plaintiff testified that while he was placed at Geller House,[38] he thought he was in jail, was scared, and did not feel free to leave. *Id.* at *6. Plaintiff testified that he left Geller House "a couple of times," even though he knew he was breaking the rules and could get into trouble, "which is why [he] usually stayed at Geller House even though [he] did not want to be there." *Id.* at *25.  His social worker told plaintiff that if he kept leaving Geller House, "it could hurt his chances of going home permanently." *Id.*

The defendants in *P.P.* argued that plaintiff failed to state a claim for false imprisonment because he was never "confined," Geller House was an "unlocked facility," from which plaintiff was able to leave at any time of the day or night. *Id.*  The court held, however, that "what P.P. personally felt about whether he was allowed to leave Geller House "is irrelevant to whether a "reasonable person" would have felt free to leave "under the totality of the circumstances." *Id.* (citing *Frey, supra* at *2).

In this case, defendants claim that plaintiff was given the option to go home and

---

[38] P.P. lived at Geller House for a period of time.  Geller House was a short-term residential facility providing assessment, emergency care, and psychotheraputic treatment. 2014 WL 4704800, at *6.

chose to stay, indicating his "consent" to staying at Curtis Hall. Defendants cite plaintiff's email as evidence that he wished to stay, after being given a "choice." In an email to defendant Taylor, plaintiff states that after he had been questioned for several hours, and he was feeling dizzy and sick, "it was strongly suggested that I go to my home country, Bangladesh." (Dkt. No. 16-2 at 36). Plaintiff states that defendant Dean Khan tried to book a plane ticket that very night, but that plaintiff "managed to convince her that I was too exhausted and strained to be able to do that." (*Id.*) Plaintiff states that he was only offered a one-way ticket, and was encouraged to attend the disciplinary hearing via Skype or telephone. (*Id.*)

The fact that plaintiff attempted to convince Dean Khan to let him stay because he was too exhausted to do anything else does not establish that he was consenting to stay in Curtis Hall, under security surveillance. In fact, it is unclear whether he knew the alleged condition of Curtis Hall at the time that he was attempting to convince Dean Khan that he should be allowed to stay in this country. The next paragraph of the email states that he was taken to his own dormitory *after* the questioning was over to gather his belongings and then escorted to Curtis Hall. Defendants state that he was offered the "choice" between Curtis Hall and a "free trip to the comfort of his home and family." However, his home and family were in Bangladesh, and leaving the United States to return home could have jeopardized his student visa and any chances he may have had to continue his studies, whether or not he prevailed at his hearing.

Because the relevant standard is whether a reasonable person would have felt free to leave under the "totality" of the circumstances, given the statements submitted

by each side, this court finds that this issue cannot be resolved on the pleadings, notwithstanding the extra documents that defendants have attached to their answer. Plaintiff has stated at least a plausible claim for false imprisonment.

## VI.   **Breach of Contract/Failure to Observe Procedures**

### A.   **Legal Standards**

"A student may sue his college or university for breach of an implied contract in certain situations." *Routh v. Univ. of Rochester*, 981 F. Supp. 2d at 207.  In *Papelino v. Albany County College of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011), the Second Circuit specified the circumstances under which an implied contract is formed between a student and his or her university.  Under New York law, an implied contract is formed when the university accepts the student for enrollment. *Id. See also Dasrath v. Ross Univ. School of Medicine*, 494 F. App'x 177, 178 (2d Cir. 2012).  If the student complies with the university's terms and completes the required courses, the university must award that student a degree. *Papelino*, 633 F.3d at 93 (citing *Carr v. St. John's Univ.*, 17 A.D.2d 632, 633, 231 N.Y.S.2d 410 (2d Dep't), *aff'd*, 12 N.Y.2d 802, 235 N.Y.S.2d 834 (1962); *Clarke v. Trs. of Columbia Univ.*, No. 95 Civ. 10627(PKL), 1996 WL 609271, at *5 (S.D.N.Y. Oct. 23, 1996)).

The terms of the agreement are contained in the university's "'bulletins, circulars, and regulations, which are made available to the student.'" *Id.* (quoting *Vought v. Teachers Coll., Columbia Univ.*, 127 A.D.2d 654, 654, 511 N.Y.S.2d 880 (2d Dep't 1987)). "Implicit in the contract is the requirement that the institution 'act in good faith in its dealing with its students.'" *Id.* (quoting *Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d

408, 413-14, 426 N.Y.S.2d 248 (1980)). However, the student must still fulfill his or her end of the bargain by satisfying the university's academic requirements and complying with its procedures. *Id.* (citing *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998)).

When a disciplinary dispute arises between the student and the university, "judicial review of the institution's actions is limited 'to whether the [institution] acted arbitrarily or whether it substantially complied with its own rules and regulations.'" *Routh*, 981 F. Supp. 2d at 208 (quoting *Jones v. Trustees of Union College*, 92 A.D.3d 997, 998-999, 937 N.Y.S.2d 475, 477 (3d Dep't 2012)). Plaintiff must identify the specific terms of the implied contract that he claims were violated by the university. *Id.* (citing *Jones*, 92 A.D.2d at 999). The failure to do so will result in dismissal of the contract claim. *Jones*, 92 A.D.3d at 999 (citing inter alia *Cavanagh v. Cathedral Preparatory Seminary*, 284 A.D.2d 360, 361, 725 N.Y.S.2d 889 (2d Dep't 2001)). "[T]he mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim upon which relief can be granted." *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998).

The application of contract principles to the student-university relationship does not provide judicial recourse for every disgruntled student." *Id.* The initial interpretation of a university's catalogue, "is a matter of law for the Court." *Deen v. New School University*, No. 05 Civ. 7174, 2007 WL 1032295, at *2 (S.D.N.Y. Mar. 27, 2007) (citing *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998)). The court also notes that a specific

disclaimer in the catalogue may excuse the university from a promise that would otherwise become a contractual obligation. *Id.* (citing *Prusack v. State*, 117 A.D.2d 729, 730, 498 N.Y.S.2d 455, 456 (2d Dep't 1986); *Gally v. Columbia Univ.*, 22 F. Supp. 2d at 206 n. 7).

## B. Application

In moving for dismissal of plaintiff's tenth and eleventh causes of action, defendants argue that the university substantially complied with its rules and did not act arbitrarily or in bad faith with regard to any of the decisions challenged by the plaintiff. Defendants also argue that if the court allows the contract claim to proceed, plaintiff's tenth and eleventh causes of action should be combined because the claim that the university failed to follow its procedures (eleventh cause of action) is part of the contract claim. (Def.s' Br. at 13-14 & n.10) (Dkt. No. 21-1 at 19-20). Defendants are correct that the tenth and eleventh causes of action must be considered together because, as stated above, the standard for evaluating a contract claim with respect to a disciplinary dispute is whether the institution substantially complied with its own rules and regulations. Based on this standard, this court finds that plaintiff has failed to state a plausible contract claim.

Plaintiff first alleges that the university used the incorrect disciplinary process. The plaintiff was disciplined using the Equity Grievance Process ("EGP") instead of the Student Conduct Board.[39] (Compl. ¶¶ 177). The complaint then enumerates other

---

[39] The complaint distinguishes between the "Student Conduct Board" form of discipline and the EGP. (Compl. ¶178). The EGP was created to address any form of harassment on the basis of actual or perceived membership in a protected class, by any member of the college community, which creates a

38

provisions of the rules that the defendants have allegedly breached by their actions against plaintiff. (Compl. ¶¶ 180(a)-(h)).

Plaintiff first states that the university has violated the requirement that "standards of consistency and equity [in disciplinary proceedings] are maintained." (Compl. ¶ 180(a)). This basis for breach of contract has been specifically rejected by courts in the Second Circuit. *See e.g. Okoh v. Sullivan*, No. 10 Civ. 2574, 2011 WL 672420, at *4 (S.D.N.Y. Feb. 24, 2011) (school's published policy of providing "fair and equal treatment" to its students is "a general statement of [its] adherence [] to existing anti-discrimination laws. It does not create a separate and independent contractual obligation."); *Knelman v. Middlebury College*, 898 F. Supp. 2d 697, 709 (D. Vt. 2012) (language in a college handbook or other official statement that is merely aspirational in nature or that articulates a general statement of a school's "ideals," "goals," or "mission," is not enforceable - including general promises about ethical standards); *Tiu Malabanan v. University of Rochester*, No. 07-CV-6499, 2008 WL 788637, at *5 (W.D.N.Y. Mar. 21, 2008) (general statements of policy do not create separate causes of action); *Gally v. Columbia Univ.*, 22 F. Supp. 2d at 208 (anti-discrimination policy does not give rise to contractual liability).

Plaintiff claims that the EGP was not the appropriate choice for the conduct with

---

hostile environment. (Compl. ¶ 174). The EGP also addresses cases of sexual harassment and violence. (*Id.*) Without detailing all the differences between the two forms of discipline, the Student Conduct Board is composed of more individuals, including students, while the EGP has only three members, none of which are students. (Compl. ¶ 178(a)). According to plaintiff, the EGP affords the individual less rights, and the individuals who make up the EGP have served for less time than those on the Student Conduct Board, and the sanctions imposed by the Student Conduct Board are "more consistent and less severe" than those imposed by the EGP. (Compl. ¶ 178(b)-(e)).

which the university charged him because it deals only with complaints of "sexual harassment, sexual assault, or other forms of discriminatory and bias-related harassment," but none of the allegations against plaintiff involved such conduct. (Compl. ¶ 177). However, in another section of the EGP, it states that this process also applies to "Violence between community members in an intimate relationship to each other." (EGP, (d)(v)). While this section states that this conduct may also be a violation of other university rules, it is covered by the EGP. The conduct alleged in this section of the EGP is exactly the conduct with which plaintiff was charged. The section implies that the same conduct could be charged under either procedure. Thus, CU did not fail to abide by its own rules in charging plaintiff under the EGP.

Plaintiff also alleges that, under the EGP procedures,[40] the associate provost for equity and diversity "is supposed to" promptly assign an EGP member to work as an advisor to the complainant. (Compl. ¶ 180(b)); *See* EGP (IV). However, as defendants point out, this "requirement" affords a benefit to the complainant, not the plaintiff, and plaintiff cannot allege breach of contract asserting rights belonging to another student. *See American Psychiatric Assoc. v. Anthem Health Plans*, No. 3:13-CV-494, 2014 WL 4823875, at *3 (D. Conn. Sept. 25, 2014) (quoting *New York State Org. for Women v. Terry*, 886 F.2d 1339, 1346-47 (2d Cir. 1989) (internal citations omitted)) (litigant may not raise the rights of a third-party).

---

[40] A copy of the EGP has been attached to the Taylor Declaration as Exhibit C. (Taylor Decl. ¶ 4 & Ex. C) (Dkt. No. 16-2). As stated above, the court has considered this document because it is relied upon by plaintiff in drafting his complaint and is therefore, incorporated by reference. The court will cite this document as the EGP.

Plaintiff cites the EGP sections which govern "interim suspensions," arguing that these sections have been violated. (EGP Rules (VII)). One section provides that an interim suspension may be imposed only when the safety or well-being of any member(s) of the campus community may be jeopardized by the presence of the accused on campus, and the next subsection provides that in cases where an interim suspension is imposed, the student in question must be given the opportunity to be heard regarding the suspension. (Compl. ¶ 180(c), 180(d)). Although it is unclear, it appears that plaintiff is claiming that he was not given a proper opportunity to oppose the interim suspension.

However, in the letter written by defendant Taylor to plaintiff on March 22, 2013, placing him on interim suspension, defendant Taylor details the reason for the interim suspension and informs plaintiff that he has the opportunity to be heard by defendant Taylor either "prior to" or as soon after the suspension "as reasonably possible" to show cause why the suspension should not be implemented. (Taylor Decl. Ex. A). The letter specifically states "I therefore invite you to make a phone appointment with me at your earliest convenience if you wish." (*Id.*) Thus, it is clear that plaintiff was given the opportunity to make a statement in opposition to the interim suspension "as soon after" the suspension "as reasonably possible." The university's rules were not violated even though plaintiff was not allowed to make a statement *prior to* the suspension taking effect.

Plaintiff cites three more procedural requirements which he alleges were violated by the defendants. (Compl. ¶¶ 180(f)-(h)). However, the documents, and plaintiff's

own allegations, show that plaintiff makes no plausible showing in support of his allegations. Plaintiff cites a statement in the EGP that when an allegations "is more properly handled" under a different policy or procedure, the associate provost will direct the matter to the appropriate personnel. (Compl. ¶ 180(c) (*see* EGP Rules (VII)). As stated above, the EGP clearly covers plaintiff's alleged conduct, thus, section VII was not violated.

Plaintiff next states that the respondent in an EGP hearing must be notified of all the charges in writing at least one week prior to the hearing. (Compl. ¶ 180(f)). Plaintiff admits in the complaint that he received the "charge letter" on March 26, 2013, and the hearing was scheduled for April 2, 2013. (Compl. ¶¶ 110-11). The charging email to which plaintiff refers has been attached to the defendants' answer, and shows that the notice, detailing each charge, was sent to plaintiff by defendant Taylor on March 26, 2013. The hearing was exactly one week later on April 2, 2013. (Taylor Decl. ¶¶ 3-4 & Ex. B). Plaintiff also cites the EGP rules providing that the hearing will "generally be convened" within one to two weeks after the completion of the investigation. (Compl. ¶ 180(g)) (*see* EGP Rules (VIII)(c)). Plaintiff admits in his complaint that he first met with defendant Brogan on March 22, 2013. (Compl. ¶ 62). The hearing was on April 2, well within the required time frame.

Finally, plaintiff states that the hearing "should" be rescheduled for compelling reasons, and that this rule was violated when defendant Taylor refused to grant him an adjournment. (Compl. ¶ 180(h)). The language of the rules provides that "For compelling reasons, the hearing panel chair *may* reschedule the hearing." EGP Rules

(VIII)(b)(2) (emphasis added). There is no requirement that the hearing be rescheduled. The use of the word "may" clearly indicates that the determination of "compelling circumstances," and the decision to reschedule the hearing is in the discretion of the hearing panel chair. Plaintiff's own allegations demonstrate the defendants' substantial compliance with the university's regulations. Because the test is "substantial compliance" with the regulations, there is no plausible contract claim stated. Plaintiff's tenth and eleventh causes of action are therefore, dismissed.

## VII. <u>Negligence</u>

### A. **Legal Standards**

In order to succeed on a negligence claim, the plaintiff must establish the existence of a legal duty, a breach of that duty, proximate causation, and damages. *Pasquaretto v. Long Island Univ.*, 106 A.D.3d 794, 795, 964 N.Y.S.2d 599 (2d Dep't 2013). The existence of such a duty is a question of law for the court. *Id.* (citations omitted). New York has affirmatively rejected the doctrine of "in loco parentis" at the college level. *Id.* In *Pasquaretto*, the court found that the college had no legal duty to shield its students from the dangerous activity of other students. *Id.* However, a duty may be imposed upon a college when it has encouraged its students to participate in an activity "and has taken affirmative steps to supervise and control the activity." *Id.* at 796 (citing *Hores v. Sargent*, 230 A.D.2d 712, 646 N.Y.S.2d 165 (2d Dep't 1996)).

### B. **Application**

Plaintiff cites *Pasquaretto* and argues that the University "supervised and controlled a biased and flawed investigation and seized and unlawfully imprisoned

43

Plaintiff." (Pl.'s Br. at 30). Plaintiff claims that because the University "controlled" the disciplinary process, a duty was created. (*Id.*) Plaintiff also cites *Parvi v. City of Kingston*, 41 N.Y.2d 553, 559, 394 N.Y.S.2d 161 (1977) for the proposition that even if no original duty is owed to plaintiff, once affirmative action is undertaken, the University was obligated to act with "reasonable care."

Neither *Parvi*, nor *Pasquaretto* support plaintiff's position. The "control" discussed in the case law involves activities over which the college exercises control and supervision, and where the plaintiff is physically injured during the activity. *See Pasquaretto*, 106 A.D.3d at 796 (citing *Hores v. Sargent*, 230 A.D.2d 712). In *Pasquaretto*, the court ultimately held that the University's involvement in a fraternity's initiation process did not give rise to a duty, and dismissed a claim of negligent supervision against the University. *Id.* By contrast, *Hores* involved a college student who was injured on a school-sponsored bicycle trip. The court denied summary judgment for the defendant, holding that the college "possessed a sufficient degree of control over the subject event, and thus was under a duty to take reasonable precautions for the safety of the participants." *Id.*

In *Parvi*, which was not a case involving a university, the police took physical control of inebriated individuals and refused to drop them off where they wanted to go. Instead, the officers dropped plaintiffs off in an area where they were ultimately struck by a car. 41 N.Y.2d at 554-55. The court stated that "we confront directly the duty of police officers to persons under the influence of alcohol who are already in their custody." 41 N.Y.2d at 559. The court stated that when a defendant takes charge of

44

another who is "helpless" to adequately aid or protect himself, the defendant is subject to liability for bodily harm caused by the defendant's failure to exercise reasonable care to secure the plaintiff's safety. *Id. Parvi* and *Pasquaretto* were not referring to a disciplinary investigation that is obviously "controlled" by the university, but which is not a "dangerous" situation from which a student must be protected.

In addition, the facts alleged in support of the plaintiff's negligence claim are similar to those alleged in connection with his contract claim – that the University breached its duty (contract) with plaintiff to follow its own rules regarding student discipline. "[S]imply alleging a duty of care does not transform a breach of contract [claim] into a tort claim." *Bd. of Mangers of Caton Court Condominium v. Caton Development*, 41 Misc. 3d 1231, 983 N.Y.S.2d 201 (N.Y. Sup. 2013) (internal quotation marks omitted). Plaintiff's negligence claim is not sustainable because he has failed to allege facts showing that the University owed plaintiff a duty under the facts alleged.

## VIII.  Intentional Infliction of Emotional Distress (IIED)

### A.    Legal Standards

In New York, in order establish IIED, plaintiff must plead and prove the following elements:

> (1) extreme and outrageous conduct; (2) the intentional or reckless nature of such conduct; (3) a causal relationship between the conduct and the resulting injury; and (4) severe emotional distress.

*Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 214 (W.D.N.Y. 2013) (quoting

*Mitchell v. Giambruno*, 35 A.D.3d 1040, 1041, 826 N.Y.S.2d 788, 789 (3rd Dep't 2006)).  New York sets a very high threshold for conduct that is "extreme and outrageous," sufficient to meet the above standard. *Alexiadis v. New York College of Health Professionals*, 891 F. Supp. 2d 418, 436 (E.D.N.Y. 2012) (quoting *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996)).  The conduct alleged must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Id.* (quoting *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985) (quoting *Fischer v. Maloney*, 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 993 (1978)).  New York courts have been very strict in applying these principles. *Id.* (citations omitted).  Very few claims satisfy the "extreme and outrageous" standard. *Id.* (citing *Elmowitz v. Executive Towers at Lido, LLC*, 571 F. Supp. 2d 370, 378 (E.D.N.Y. 2008)).

## B. Application

In this case, plaintiff has cited to no conduct that was so "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."  Plaintiff appears to allege that all defendants' actions, in the aggregate, rise to the level of outrageous conduct. (Pl.'s Br. at 30-31).  Plaintiff argues that his false imprisonment, lengthy interrogation, threats of "false criminal charges," failure to allow sufficient time to prepare for his hearing, expulsion without sufficient reason, refusal to consider claims of discrimination in his appeal, and "apparent" contact of immigration officials all contributed to the outrageous conduct. (*Id.*)

This court does not agree. In *Routh*, the court dismissed plaintiff's state law IIED claim notwithstanding a female student's allegations of rape and other criminal behavior by the plaintiff. 981 F. Supp. 2d at 214-15. The court stated that false accusations of criminal conduct were not sufficiently outrageous. *Id.* at 214. In this case, the failure to give someone time to review the charges against him does not rise to the level of conduct that goes beyond the bounds of decency. The failure to consider portions of plaintiff's appeal also fails to rise to an outrageous level. *See e.g. Fraad Wolff v. Vassar College*, 932 F. Supp. 88, 93-94 (S.D.N.Y. 1996) (student complained that defendants conducted a "witch hunt" regarding incident at Vassar College involving abusive telephone calls); *Fellheimer v. Middlebury College*, 869 F. Supp. 238, 247 (D. Vt. 1994) (A college's decision, when confronted with a female student's accusation of rape, to confront male student with the charges, hold a hearing, and support the findings of the tribunal on appeal cannot form the basis of an IIED claim, even if various procedural errors are alleged by the plaintiff.) In this case, plaintiff claims that his interrogation was lengthy, and that he was not given anything to eat. However, the complaint states that at 7:30 p.m., he told defendant Khan that he was faint and dizzy from the lack of food, and at 8:00, he was brought a sandwich. (Compl. ¶ 75). Although plaintiff then states he was too upset to eat, this does not constitute "extreme and outrageous conduct" by the defendants.

Courts in New York also do not allow IIED claims where "the conduct complained of falls well within the ambit of other traditional tort liability.'" *Alexiadis*, 891 F. Supp. 2d at 437 (quoting *McGrath v. Nassau Health Care Corp.*, 217 F. Supp.

2d 319, 335 (E.D.N.Y. 2002) (quoting *Lian v. Sedgwick James, Inc.*, 992 F. Supp. 644, 651 (S.D.N.Y. 1998)). *See also Crews v. County of Nassau*, 996 F. Supp. 2d 186, 214 (E.D.N.Y. 2014) (IIED claim dismissed when the facts were the very same facts that supported his claims for malicious prosecution and assault and battery).  In *Lian*, the court dismissed a claim of IIED based upon the defendants publication of libel because the claim was duplicative of plaintiff's cause of action in libel. 992 F. Supp. at 651.

Plaintiff attempts to avoid this rule by stating that facts alleged are not entirely covered by the traditional tort of false imprisonment. (Pl.'s Br. at 30).  Plaintiff then lists all the other facts that allegedly support the IIED claim, including the threats of false criminal charges, the inadequate time to prepare for his disciplinary hearing, the defective appeals process, the alleged telephone call to his parents, the improper expulsion from school, and the alleged report to immigration officers, all of which this court finds are insufficient to rise to the level of extreme and outrageous conduct. These allegations are also the factual bases for plaintiff's discrimination claim.  The only remaining set of factual allegations that plaintiff believes fits the standard for IIED is his false imprisonment claim.  However, he has already alleged false imprisonment, and this court has allowed that claim to proceed.  The IIED claim is therefore duplicative and should be dismissed.

## IX.  <u>Individual Defendants</u>

Defendants argue that the complaint must be dismissed as against individual defendants Christina Khan, Daniel Tucker, Stephen Cook, and Jeffery Herbst.  The remaining claims in this action are under 42 U.S.C. § 1981; Title VI, 42 U.S.C. § 2000d

48

et seq.; Title IX, 20 U.S.C. § 1681 et seq.; the New York State Constitution; the New York Human Rights Law, N.Y. Exec. Law § 296 et seq.; and a state claim for False Imprisonment. As defendants correctly argue, individual defendants may not be held liable under Title VI or Title IX because those statutes apply only to the educational entity that receives the federal funds. *See Romero v. City of New York*, 839 F. Supp. 2d 588, 616-17 (E.D.N.Y. 2012) (Title IX) (citing *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 257 (2009)); *Kelly v. Rice*, 375 F. Supp. 2d 203, 208 (S.D.N.Y. 2005) (Title VI) (citing inter alia *Jackson v. Univ. of New Haven*, 228 F. Supp. 2d 156, 158 (D. Conn. 2002)). Thus, the only remaining claims that may be brought against the individual defendants are the claims under the New York State Constitution; the New York Human Rights Law, N.Y. Exec. Law § 296 et seq.; and the False Imprisonment claim.

### A. Christina Khan

Christina Khan is the Assistant Dean and Director of International Student Services. The complaint states that defendant Khan was sent by defendant Rugg to "be present" during plaintiff's interrogation. (Compl. ¶ 67). Plaintiff alleges that, although he was told that defendant Khan was there "to support him," she made no effort to do so. (Compl. ¶ 68). Plaintiff claims that he told defendant Khan that he was having trouble "expressing himself," but defendant Khan failed to "rectify the situation." (Compl. ¶ 72). Plaintiff alleges that defendant Khan encouraged plaintiff to go back to Bangladesh. (Compl. ¶ 89).

However, plaintiff also appears to imply that defendant Khan may have been

responsible for plaintiff being allowed to return to his room to get an ethernet cable and some other belongings so that he could have computer access from his Curtis Hall location. (Compl. ¶ 90). Plaintiff claims that defendant Khan brought him a telephone, notwithstanding that she also encouraged him to go home to Bangladesh. (Compl. ¶ 95). Plaintiff does allege that defendant Khan "falsely told" Professor Kagle in a telephone call that plaintiff did not wish to leave Curtis Hall on the evening of March 23, 2013. (Compl. ¶ 99). Plaintiff also alleges that on April 1, 2013, defendant Khan was involved in a telephone conversation with defendant Nelson and plaintiff's parents, during which defendants Khan and Nelson falsely informed plaintiff's parents that criminal charges could be brought against plaintiff and encouraged them to persuade him to return to Bangladesh. (Compl. ¶ 123).

None of the conduct alleged by plaintiff states a claim against defendant Khan under the remaining causes of action. The failure to afford plaintiff "sufficient" support at his interrogation does not state a claim for any violation. Plaintiff claims that she "practically ignored him" when he told her that he had hardly slept and had eaten nothing," however, when plaintiff mentioned that he was hungry, he was given a sandwich thirty minutes later. Defendant Khan is not alleged to have been involved in the decision to place him in the Curtis Hall location,[41] and she was only present during the interrogation by defendant Brogan. The fact that plaintiff was unhappy with the assistance that defendant Khan gave him is not the basis for any of the remaining

---

[41] The complaint states that defendants Rugg, Taylor, and others, in consultation with attorney Doe, "had already decided to detain" plaintiff in the Curtis Hall room. (Compl. ¶ 83). It is unclear who the "others" might be, but Khan is not specifically mentioned as a decision-maker.

claims.

In fact, defendant Khan's potential assistance in obtaining an ethernet cable and a telephone allowed plaintiff to communicate with the outside world when he was staying in Curtis Hall. Her assistance actually helped plaintiff. Her participation in a telephone call with plaintiff's parents in which either she or defendant Nelson may have falsely stated that criminal charges could be pursued and may have asked plaintiff's parents to encourage the plaintiff to go home does not state any claim under the remaining statutes. Thus, the court will order dismissal of the action as to defendant Khan.

### B.    Daniel Tucker & Stephen Cook

These two individuals are Campus Security Officers. Plaintiff alleges that they harassed him while he was trying to review the file in his case. (Compl. ¶¶ 116-18). Plaintiff also appears to allege that defendant Cook told plaintiff that his host mom would not be picking him up because she had been "pulled over" by the Hamilton Police. (Compl. ¶ 119).

None of the cited conduct states a claim under any of the remaining causes of action. The court would point out that even if a section 1983 cause of action remained, verbal harassment, as offensive or inappropriate as it may be, does not state a constitutional claim. *Holland v. Morgenstern*, No. 12-CV-4870, 2013 WL 2237550, at *8 (E.D.N.Y. May 20, 2013) (citing *Jean–Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 324–25 (S.D.N.Y.2006) (claim of verbal abuse not cognizable under § 1983 because verbal intimidation did not rise to the level of a constitutional violation)). Mere threats or "other petty oppressions, no matter how upsetting" are also insufficient to constitute

the tort of IIED. *Rother v. NYS Dep't of Corrections and Community Supervision*, 970 F. Supp. 2d 78, 105 (N.Y.N.D. 2013) (citing inter alia *Owen v. Leventritt*, 174 A.D.2d 471, 571 N.Y.S.2d 25, 25 (1ˢᵗ Dep't 1991)). Thus, the complaint may be dismissed as against these defendants.

### C.   Jeffrey Herbst

Defendant Herbst is the President of CU**.** As discussed above, individuals are not liable under Title VI or Title IX. Thus, defendant Herbst may not be named in either the Title VI or the Title IX claim. Plaintiff alleges that defendant Herbst may be liable under the state law causes of action and section 1981. (Pl.'s Br. at 32). Plaintiff seeks to hold this defendant responsible because he allegedly "knew about Faiaz's interim suspension, hearing, and expulsion," and "apparently ratified the wrongful conduct by not redressing it." (*Id.*)

In order to state a claim for individual liability under section 1981, the plaintiff must demonstrate "some affirmative link to causally connect the actor with the discriminatory action." *Dasrath v. Stony Brook University Medical Center*, No. 12-CV-1484, 2014 WL 1760907, at *7 (E.D.N.Y. Apr. 19, 2014) (citing *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004)). It must be shown that the defendant had "personal involvement" in the alleged discriminatory conduct. *Davis Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 688 (S.D.N.Y. 2012) (citation omitted).

"The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or

appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (*citing, inter alia, Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986)).[42]

Even prior to *Ashcroft*, courts held that personal involvement requires that the individual who is, or becomes aware of, the violation, have the ability to take action to correct the problem. *See Conklin v. City of Suffolk*, 859 F. Supp. 2d at 441-42 (personal involvement requires knowledge *and* the ability to take action). In this case, plaintiff appeared before the EGP panel on April 2, 2013, and plaintiff received the letter expelling him on April 3, 2013. (Compl. ¶¶ 129, 141). Plaintiff filed his appeal on April 10, 2013, and the appeal was denied by defendant Hicks on May 1, 2013. (Compl. ¶¶ 144, 150).

---

[42] Many courts in this Circuit have discussed whether all of the personal involvement factors, set forth in *Colon*, are still viable after *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). *See, e.g., Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*. *Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.'" *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). See also *Young v. Choinski*, 15 F. Supp. 3d 172, No. 3:10-CV-606, 2014 WL 962237, at *10-12 (D. Conn. Mar. 13, 2014) ("Although *Iqbal* does arguably cast doubt on the viability of certain categories of supervisory liability, where the Second Circuit has not revisited the criteria for supervisory liability, this Court will continue to recognize and apply the *Colon* factors.").

Defendant Herbst was not involved in the investigation, the hearing, or the appeal process. Plaintiff does not claim otherwise. Plaintiff alleges that upon information and belief, "several meetings were held with CU faculty and administrators to discuss what had transpired with Mr. Faiaz." (Compl. ¶ 162). Plaintiff alleges that the meetings occurred "before and after Mr. Faiaz's expulsion." (*Id.*) Plaintiff alleges that defendant Herbst and others attended "some or all of these meetings." (*Id.*) Plaintiff then states that, at one of the meetings, defendant Herbst was "confronted" with what happened to plaintiff, and "he said he was aware of the situation." (Compl. ¶ 163). He also allegedly stated that when Val Brogan "tells me someone has the profile of an abuser, I believe her," and he did not deny that plaintiff "had been detained." (*Id.*)

While plaintiff alleges this shows defendant Herbst's personal involvement, it does not. Plaintiff alleges that the earliest of the meetings in question happened "the week of March 25, 2013. March 25, 2013 was a Monday. At the time of this meeting, plaintiff's "detention" was over, and he was residing with his host parent. Defendant Herbst could not have remedied an alleged situation that had already been remedied. Thus, defendant Herbst was not personally involved in any false imprisonment allegations. Defendant Herbst's statement that he believes his investigator does not show knowledge of, or personal involvement in, any discrimination that may or may not have occurred. Defendant Herbst was not a part of the appeal process, and thus would not necessarily have been aware of the plaintiff's allegations. Therefore, the complaint may be dismissed as against defendant Herbst based on a lack of personal

involvement.

### D.  John Doe

Plaintiff alleges that lawyer, John Doe, who has now been identified as Philip Zaccheo,[43] was involved in the decision to "detain" the plaintiff in Curtis Hall instead of a hotel room off campus.  Under New York law, "an attorney generally cannot be held liable to third parties for actions taken in furtherance of his role as counsel unless it is shown that he 'did something either tortious in character or beyond the scope of his honorable employment.'" *Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d 1057, 1080 (2d Cir. 1977) (quoting *Dallas v. Fassnacht*, 42 N.Y.S.2d 415, 418 (Sup. Ct. N.Y. Cty. 1943)).  An attorney is privileged to give honest advice, even if erroneous, and will generally not be responsible for the motives of his clients.  However, "admission to the bar does not create a license to act maliciously, fraudulently, or knowingly to tread upon the legal rights of others." *Id.* (citations omitted).  Where the allegations in the complaint show that counsel was not acting beyond the scope of his employment, by either placing his own interests or those of another before the interests or instructions of the client, even erroneous advice will not expose counsel to liability to the third party. *See Barsoumian v. Williams*, No. 14-CV-229S, 2014 WL 2945740, at *10 (W.D.N.Y. June 30, 2014) (complaint failed to state a claim against university's attorney who advised the university defendants on the issue of student's termination from a

---

[43] The court notes that Attorney Zaccheo has not actually been added as a defendant in this action.  Plaintiff has not moved to amend the complaint, and Attorney Zaccheo has not been served.  Thus, although both parties refer to him as if he is a defendant, the court will simply analyze this issue as it relates to "John Doe" attorney, regardless of his actual identity.

probationary position in the surgical residency program).

In *Barsoumian*, plaintiff alleged tortious interference with contract against the university's in-house counsel based upon counsel's allegedly erroneous advice to medical school officials about the requirements of the school's grievance procedures. *Id.* Counsel allegedly "intentionally and maliciously chose not to direct the other defendants to follow the terms of [the proper procedures] and failed to prevent the officials from engaging in other impermissible actions. *Id.* The court held that "at best" the plaintiff's allegations described the attorney's failure to correctly advise the university officials regarding the requirements of the grievance procedure, conduct which did not exceed the scope of her privilege to give "honest advice, even if erroneous." *Id.*

In this case, plaintiff alleges that "upon information and belief," defendants Rugg, Taylor and others, "in consultation with [lawyer Doe] had already decided to detain Mr. Faiaz in a basement room at Curtis Hall during his interim suspension." (Compl. ¶ 83). Even if this conclusory statement by plaintiff is true, there is absolutely no evidence to even allege that defendant Doe knew what the room was like or whether plaintiff would decide that he wished to go home and would not be staying in the room. Whether his advice was erroneous is not the basis for any claim.[44]

---

[44] As stated above, although the complaint lists the attorney-defendant as John Doe, plaintiff now alleges that the proper defendant is Philip Zaccheo, Esq., an attorney in the firm representing defendants. However, Attorney Zaccheo is not yet a defendant in this action. To the extent that plaintiff would move to amend his complaint to add Philip Zaccheo as a defendant, the court would deny that motion as futile, based on the analysis above. A motion to amend should not be denied unless there has been undue delay, bad faith, undue prejudice to the opposing party, or the amendment is futile. *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001). In this case, amendment of

56

## X. **Respondeat Superior**

Defendants argue that plaintiff's Fourteenth Cause of Action: "Respondeat Superior" should be dismissed because it is not an "independent" cause of action. (Def.s' Mem. of Law at 18). Plaintiff concedes that respondeat superior is not a "free-standing" claim for relief, but argues that it has been pled separately to "avoid the duplication of including the necessary respondeat superior allegations in each preceding cause of action." (Pl.'s Mem. of Law at 29). The court notes that the Fourteenth Cause of Action states that it applies only to CU as a defendant. Clearly, there is no "respondeat superior" without the underlying liability. *Alexander v. Westbury Union Free School Dist.*, 829 F. Supp. 2d 89, 112 (E.D.N.Y. 2011). As stated above, Title VI and Title IX claims may be asserted only against the educational entity. Thus, no separate "respondeat superior" allegations are necessary. To the extent that plaintiff agrees that this is not a separate cause of action, and is applicable only to claims in which respondeat superior may be available as against CU, the court will not order dismissal of the cause of action based upon plaintiff's form of pleading.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to consider previously unavailable evidence (Dkt. No. 39) is **DENIED**, and it is

**ORDERED**, that defendants' motion for partial judgment on the pleadings (Dkt. No. 21) be **DENIED** as to plaintiff's cause of action for false imprisonment and for "respondeat superior" as discussed above, and it is

---

the action to assert claims against Attorney Zaccheo would be futile.

**ORDERED**, that defendants' motion for partial judgment on the pleadings (Dkt. No. 21) be **GRANTED IN ALL OTHER RESPECTS**, and it is

**ORDERED**, that plaintiff's complaint be dismissed in its entirety as against defendants **KHAN, TUCKER, COOK, HERBST, and DOE**.

Dated: November 24, 2014

Hon. Andrew T. Baxter
U.S. Magistrate Judge